1                **UNITED STATES DISTRICT COURT**

2            **EASTERN DISTRICT OF NORTH CAROLINA**

3                           )

    **UNITED STATES OF AMERICA,**    )

4                           )   **DOCKET NO. 5:19-CR-00018-FL-1**

                  **Plaintiff,**   )

5                           )

    **vs.**                    )

6                           )

    **DEANDRE LAMONT MILES,**        )

7                           )

                   **Defendant.**  )

8

9        **TRANSCRIPT OF PROBABLE CAUSE & DETENTION HEARING**

        **BEFORE MAGISTRATE JUDGE ROBERT T. NUMBERS, II**

          **THURSDAY, DECEMBER 27, 2018; 10:17 AM**

10               **RALEIGH, NORTH CAROLINA**

11

    **FOR THE PLAINTIFF:**

12        Unites States Attorney's Office

       By: Nick Miller, AUSA

13        310 New Bern Avenue

       Federal Building, Suite 800

14        Raleigh, NC 27601

15

    **FOR THE DEFENDANT:**

16        Federal Public Defender's Office

       By: Rosemary Godwin, Esq.

17        150 Fayetteville Street

       Suite 450

18        Raleigh, NC 27601

19   Audio Operator:                CLERK'S OFFICE PERSONNEL

20

                   eScribers, LLC

21               7227 N. 16th Street

                Suite 207

22             Phoenix, AZ 85020

              973-406-2250

23             www.escribers.net

24   Proceedings recorded by electronic sound recording; transcript

          produced by transcription service.

25

```
 1                        I N D E X
                                                          VOIR
 2   WITNESSES:            DIRECT   CROSS   REDIRECT   RECROSS   DIRE
     For the Plaintiff:
 3   Jeffrey White            3       10

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

(973) 406-2250 | operations@escribers.net | www.escribers.net

Colloquy

P R O C E E D I N G S

1

2    THE COURT:  All right.  The next matter on the

3    Court's docket is United States of America v. Deandre Lamont

4    Miles, case number 5:18-MJ-2133.  We're here today for Mr.

5    Miles' detention and preliminary hearings.  It's my practice

6    to conduct both of those hearings together unless there's an

7    objection from counsel.  Ms. Godwin, any objection?

8        MS. GODWIN:  No, Your Honor.

9        THE COURT:  Any objection from the government?

10       MR. MILLER:  No, Your Honor.

11       THE COURT:  All right.  The government bears the

12   burden on the matter of probable cause, so I'll ask the

13   government to proceed first today.

14       MR. MILLER:  The United States will call Agent

15   Jeffrey White.

16        PLAINTIFF'S WITNESS, JEFFREY WHITE, SWORN

17        AGENT WHITE:  Yes.

18        THE CLERK:  Have a seat.

19                    DIRECT EXAMINATION

20   BY MR. MILLER:

21   Q.   Agent White, if you'll please state your full name for

22   the record?

23   A.   My name's Jeffrey White.

24   Q.   Okay.  And what do you do for a living?

25   A.   I'm a special agent with the Department of Homeland

1   Security, Homeland Security Investigations.

2   Q.   How long have you been working for HSI?

3   A.   I've been working with Homeland Security since before the

4   merger in 2003.  Before that, I was employed by the United

5   States Custom Service.

6   Q.   And as (indiscernible) of employment, did you come to

7   investigate someone later known to you as Deandre Miles?

8   A.   Yes, sir, I did.

9   Q.   Do you see that individual in the courtroom today?

10  A.   Yes, sir.

11  Q.   Would you describe an article of clothing --

12  A.   He's the gentleman seated at the defense table.

13  Q.   And how did your investigation begin into Deandre Miles?

14  A.   I was contacted by the Halifax County Sheriff's Office in

15  November of 2018 regarding an individual that they had been

16  investigating who they believed was bringing large amounts of

17  heroin and opiates into Halifax County and the surrounding

18  counties.

19  Q.   Do you know if Halifax County was using informants or had

20  done any control purchases from the defendant?

21  A.   Halifax County was using informants to gather some of

22  that information.

23  Q.   Do you remember how many informants they were using?

24  A.   I don't know exactly how many informants.  I am aware

25  that there were at least three.

Jeffrey White - Direct

1   Q.   How did you continue the investigation?

2   A.   Working in partnership with state and local law

3   enforcement there in Halifax County, we obtained a court order

4   to monitor cellular traffic and cellular data from Mr. Miles'

5   phone and an individual named Moody (ph).  Information was

6   gathered by Halifax County that Mr. Miles and Mr. Moody were

7   going to travel to New York City to purchase a amount of

8   heroin and then transport it back to Halifax County.  We were

9   unable to intercept that vehicle on its return from New York,

10   but we did later learn from sources that there was indeed

11   controlled substances in that vehicle, and a short time after

12   that, Halifax County got a court order to place a GPS tracker

13   on a vehicle that was known to be utilized by Mr. Miles to

14   transport narcotics, and we monitored and surveilled Mr. Miles

15   and that vehicle for a period of time, culminating in December

16   of this year.

17        December, the tracker began to travel from an area that

18   was known to be frequented by Mr. Miles to a location in

19   Charlotte, North Carolina, that we were not familiar with.

20   The duration and the stops that that vehicle made were

21   suspicious in nature; in that, he stopped in several locations

22   for a short period of time, stopped at an apartment complex

23   for a short period of time, and then immediately left the

24   Charlotte area, traveling eastbound back towards -- back

25   towards his home.  We effected a traffic stop in conjunction

Jeffrey White - Direct

1    with the Granville County Sheriff's Office and --

2    Q.    Did that traffic stop occur on December 18th?

3    A.    Yes, sir, it did.

4    Q.    And you said Granville County?

5    A.    Yes, sir.

6    Q.    Where did the traffic stop actually take place?

7    A.    In the vicinity of exit 186 off of Interstate 85 in

8    Granville County.

9    Q.    And is that in the Eastern District, North Carolina?

10   A.    Yes, sir, it is.

11   Q.    And what occurred at the traffic stop?

12   A.    The -- my understanding of the traffic stop -- I was not

13   present when the actual stop occurred, but I have reviewed the

14   reports that were presented by the Granville County Sheriff's

15   Office, and I did arrive at the end of the -- end of the

16   traffic stop.

17         But they effected that stop there on -- in the vicinity

18   of the highway.  There was a canine sweep of the vehicle with

19   a positive alert for narcotics, and then pursuant to a search,

20   approximately one kilogram of suspected fentanyl was recovered

21   from the vehicle.

22   Q.    Were there any other occupants of the car that the

23   defendant was driving?

24   A.    Yes, sir.  I'm -- based on my investigation, I'm familiar

25   with both Mr. Miles and Mr. Miles' spouse, Jasmine Parker

Jeffrey White - Direct

1    (ph), also known as Jasmine Miles.  Both of those individuals

2    were in Mr. Miles' vehicle on the day that that traffic stop

3    occurred.

4    Q.    And do you know what type of vehicle Miles was driving on

5    December 18th?

6    A.    He was driving a black in color Chevrolet Camaro.

7    Q.    Have you become familiar with that vehicle in your

8    investigation into the defendant?

9    A.    Yes, sir, I have.  And that was the vehicle that the GPS

10   tracker had been installed on.

11   Q.    After the Granville County Sheriff's Office recovered the

12   suspected fentanyl in the vehicle, did you arrive?

13   A.    Yes, sir.  I did.

14   Q.    What occurred once you arrived?

15   A.    Upon my arrival, Mr. Miles called out to me from the

16   front seat of one of the sheriff's patrol cars and asked to

17   speak with me.  I had previously been told by the sheriff's

18   department that Mr. Miles had declined to talk with law

19   enforcement, and after the second or third time he called out

20   to me, I asked one of the deputies to turn on his body camera

21   to record, you know, the interaction I would have with Mr.

22   Miles.

23        I explained to him that since he had already requested

24   not to speak to law enforcement, that that wasn't something

25   that we could do right there.  And Mr. Miles insisted that he

Jeffrey White - Direct

1    speak with me.  And I told him that right there was not a --

2    was not a good place for us to have an interview, but that we

3    would go to the Granville County Sheriff's Office Annex in

4    Butner and that we could talk there.

5        When we got to Butner, I was joined by a SBI, a North

6    Carolina State Bureau of Investigation Special, agent where we

7    reviewed and we went over Mr. Miles' Miranda rights and

8    explained to him that that conversation had to be instigated

9    by him -- initiated by him -- and that because he had

10   previously said he didn't want to talk to us, he needed to

11   reach out to us.  And he indicated that he did want to speak

12   with us and, in fact, did speak with us for three or four

13   hours after that.  And this was after being advised of his

14   Miranda rights.

15   Q.   With regards to the fentanyl inside the black Camaro on

16   December 18th, did the defendant make any statements?

17   A.   He did.  Mr. Miles wanted it to be known that the drugs

18   that were recovered from the inside of his car was solely his

19   responsibility, and that his spouse, Ms. Parker -- Ms.

20   Miles -- had nothing to do with it.  That seemed to be what

21   Mr. Miles was mostly interested in conveying.

22   Q.   What else was discussed in the interview?

23   A.   So we asked Mr. Miles where did -- where did these pills

24   come from and how much did he pay for it.  Mr. Miles told us

25   that he had been in contact with this organization based out

Jeffrey White - Direct

1   of Charlotte, North Carolina, for a -- for a period of time,

2   and that he had begun contacting them the previous weekend,

3   arranging a meeting in Charlotte.  He was to pay $50,000 for

4   this one kilogram of fentanyl.  He gave us the nickname of the

5   person that he purchased the fentanyl from, and he gave us an

6   approximate address where it was.  He couldn't remember

7   precisely -- precisely the address, but eventually through

8   Google Earth and kind of a general knowledge of Charlotte, we

9   were able to figure out which apartment it was that -- that he

10  went to.  He then told us that he traveled to the outlet malls

11  in Mebane, where they did some shopping, and that they were on

12  their way back to their residence in Granville County.

13  Q.   And was that information corroborated with what you knew

14  from the GPS tracker?

15  A.   Yes.

16  Q.   With regards to the suspected fentanyl, did you observe

17  it that day?

18  A.   I did, yes.

19  Q.   Did it appear to be consistent with what you know about

20  fentanyl from your training and experience?

21  A.   Yes, it is.

22  Q.   Do you remember how it was packaged?

23  A.   It was packaged in a large Ziploc bag.  It was in itself

24  wrapped in a -- like, a plastic shopping bag, and that was

25  contained inside a shoebox that was behind the driver's seat

Jeffrey White - Cross

1  in the Camaro, wedged in between the driver's seat and the

2  back seat.

3  Q.   And what about the fentanyl itself -- was it in powder

4  form, pill form?

5  A.   It was in pill form.

6  Q.   Did you do an approximation as to how many pills were

7  present?

8  A.   I did not.  We just weighed the bulk amount.

9  Q.   And --

10 A.   It was many thousands of pills.

11 Q.   And it was right around a kilogram?

12 A.   2.24 pounds.

13         MR. MILLER:  If I could have a moment, Your Honor.

14         THE COURT:  You may.

15         MR. MILLER:  No further questions at this point.

16         THE COURT:  Cross-examination.

17         MS. GODWIN:  Thank you, Your Honor.

18                     CROSS-EXAMINATION

19 BY MS. GODWIN:

20 Q.   Good morning.

21 A.   Good morning, ma'am.

22 Q.   My name's Rosemary Godwin, and I have a few questions for

23 you.

24 A.   Yes, ma'am.

25 Q.   Agent White, you mentioned that there were at least three

Jeffrey White - Cross

1    confidential informants to your knowledge utilized by the

2    Halifax County Sheriff's Department?

3    A.    Yes, ma'am.

4    Q.    Are you aware of any controlled purchases of any kind of

5    drugs from Mr. Miles?

6    A.    I am not aware of any.

7    Q.    And did you prepare the affidavit for the criminal

8    complaint?

9    A.    Yes, ma'am, I did.

10   Q.    And I noted in that, when I reviewed it, that there was

11   no indication of any controlled buys in this affidavit?

12   A.    There -- there are not.

13   Q.    You indicated that there had been a court order for cell

14   phone and cellular data?

15   A.    Yes, ma'am.

16   Q.    And was that real-time data or historical data?

17   A.    Both.

18   Q.    And you indicated that in the affidavit that you were

19   able to confirm that Moody went to New York?

20   A.    Yes, ma'am.

21   Q.    But when I reviewed the affidavit there was no indication

22   that you had tracked Mr. Miles himself going to New York; is

23   that correct?

24   A.    Outside of the vehicle?

25   Q.    Outside of --

Jeffrey White - Cross

1   A.   The Camaro.

2   Q.   The Camaro -- you had tracked the Camaro going to New

3   York?

4   A.   The Camaro was not present at his home, and it also

5   wasn't present at the location in Halifax County where it is

6   known to be, and right after Mr. Moody and Mr. Miles were

7   known to return from New York City, the Camaro was present.

8   Q.   I understand; but my question was, you didn't track Mr.

9   Miles himself going to New York?  His cell phone.  It just

10  mentions Mr. Moody's cell phone.

11  A.   That's right.

12  Q.   Okay.  And at that point you didn't have a GPS tracker on

13  the Camaro?

14  A.   That's correct.

15  Q.   So you didn't track Mr. Miles himself through any

16  electronic surveillance going to New York?

17  A.   Correct.

18  Q.   And you indicated that on December the 18th -- well, by

19  December the 18th you had a GPS on Mr. Miles' Camaro?

20  A.   Yes, ma'am.

21  Q.   And you indicated that you saw some movement, and that it

22  went to Charlotte -- the GPS tracker indicated Mr. Miles'

23  Camaro was going to Charlotte?

24  A.   Yes, ma'am.

25  Q.   But you were not familiar with any location or any source

Jeffrey White - Cross

1    of supply of Mr. Miles in Charlotte?

2    A.   Among the historical information that was provided to me

3    from Halifax County was that Mr. Miles' source of supply may

4    well be in South Carolina, and I knew that -- South Carolina

5    and Charlotte are very close to each other.

6    Q.   And you just testified in response to Mr. Miller's

7    questions that you were not familiar with Charlotte as a

8    location or a source for Mr. Miles?

9    A.   That's right.  Well, it was a place that I did not know

10   him to have gone.  We had not observed him, using our

11   surveillance, to have gone to Charlotte before.

12   Q.   All right.  So you -- based on the pattern of his car

13   activity that day -- you made a decision to conduct an

14   investigatory traffic stop?

15   A.   Yes, ma'am.

16   Q.   And you contacted Granville County, and I believe that

17   was Deputy Spence (ph)?

18   A.   Yes, ma'am.

19   Q.   Okay.  Now, when Deputy Spence got involved, he made an

20   effort to do a background check on Mr. Miles --

21   A.   Yes, ma'am.

22   Q.   -- before he pulled the car over.  Right?

23   A.   Yes, ma'am.

24   Q.   Because it would be fair to say at this point in time you

25   didn't have clear probable cause to pull the vehicle over?

Jeffrey White - Cross

1    A.    I -- no, I don't agree with that.

2    Q.    Well, he's driven his car to Charlotte, which an unusual

3    for him as far as you know, right?  I mean --

4    A.    He did drive his car to Charlotte.

5    Q.    And you didn't have any information that he was going

6    there to pick up any contraband?

7    A.    According to the information that we had gotten from the

8    sheriff's office that he uses that car --

9    Q.    Um-hum.

10   A.    -- travels to make purchases of bulk amounts of

11   controlled substances and transport it back to Halifax or

12   Northampton County for sale.

13   Q.    And your information was that he had made trips to New

14   York?

15   A.    And that some of his source of supply may well be in

16   South Carolina.

17   Q.    So on December the 18th it would be fair to say you did

18   not have information that he was going to Charlotte to pick up

19   any contraband?  You just were --

20   A.    I -- no, I don't -- I don't agree with that.  I think

21   that there is a pattern that we have developed through

22   confidential sources and his previous trips that that vehicle

23   was used to transport narcotics, and that he drove close to a

24   place where he's known to source narcotics from and was on his

25   way back from that.  Combining that with brief stops at two

Jeffrey White - Cross

1  gas stations and a brief stop at an apartment complex

2  before -- pardon me -- immediately returning -- that's

3  suspicious activity.

4  Q.   In your view?

5  A.   Yes, ma'am.  In my view.

6  Q.   But when Deputy Spence got involved, he didn't just go

7  ahead and initiate a traffic stop, did he?  He took some extra

8  steps.

9  A.   I --

10  Q.   Okay.

11  A.   In terms of --

12  Q.   Let me -- that's not a good question.  I agree with that.

13  Okay.  Let me ask it this way.  When Deputy Spence got

14  involved, he ran a criminal history check, a background check,

15  on Mr. Miles and determined that in his view there was an

16  active warrant out for Mr. Miles?

17  A.   I -- I believe that's correct.

18  Q.   And have you seen that warrant?

19  A.   I have not seen it.  But I understand that it did turn

20  out to be an active warrant from Northampton County.

21  Q.   And are you aware that the active warrant for Northampton

22  County was actually for Daniel Miles -- in the name of Daniel

23  Miles?

24  A.   No.

25  Q.   And that Deputy Spence initiated a traffic stop for Mr.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Jeffrey White - Cross

1    Miles' Camaro based on an active warrant for a Daniel Miles

2    and not a Deandre Miles?

3    A.   I don't know that.

4    Q.   And it would be reasonable to believe or to suspect that

5    Mr. Miles utilized that Camaro for transportation activities

6    other than drug-related activities as well?

7    A.   I don't have any specific information about that, no.

8    Q.   So you don't think it's reasonable that he might take

9    that car to go shopping or go to the grocery store --

10   A.   I -- I believe he did take that car -- you know, part of

11   the trip was that they stopped at the outlet stores in Mebane;

12   what I'm saying is, I don't have any specific information

13   about what Mr. Miles uses that car for on a -- you know,

14   during his day-to-day routine.

15   Q.   Okay.  Thank you.  Are you aware that Mr. Miles had not

16   been driving that car but a couple of months?

17   A.   I believe he purchased it in October.

18   Q.   Okay.  Thank you.

19        THE COURT:  Ms. Godwin, is that all?

20        MS. GODWIN:  Oh, that's all.  Thank you.  I'm sorry.

21        THE COURT:  Redirect?

22        MR. MILLER:  No, Your Honor.

23        THE COURT:  Thank you, sir, you may step down.

24        (Witness excused)

25        MR. MILLER:  Your Honor, nothing to show from the

Jeffrey White - Cross

1    government.

2            THE COURT:  Thank you.  Ms. Godwin, any evidence

3    to --

4            MS. GODWIN:  No, Your Honor.

5            THE COURT:  All right.  Any argument from the

6    government?

7            MR. MILLER:  Your Honor, with regards to probable

8    cause, the Court has to determine whether or not an offense

9    occurred and whether or not you believe that this defendant

10   was the person who committed the offense.

11           Based on the testimony of Agent White, we know that

12   the defendant on December 18th went to Charlotte and on his

13   way back to the Northampton or Halifax area was stopped in

14   Granville.  Inside that vehicle, officers found approximately

15   a kilogram of what they believed to be fentanyl, of what the

16   defendant himself said was fentanyl -- that he paid $50,000

17   for -- inside the vehicle.  He said it was his, that the other

18   occupant of the vehicle, his wife, was not involved.

19           So based on those facts alone, the government

20   contends that's sufficient with regards to probable cause.

21           With regards to detention, Your Honor, this is a

22   presumption case.  If you look at the pre-trial services

23   report, that runs through the defendant's lengthy history; he

24   was currently on probation at the time of this offense for

25   something that occurred in Virginia.  The government would

Jeffrey White - Cross

1    contend that he does -- or he is a sufficient danger to the

2    community based on the -- solely on the amount of the drugs

3    that he was bringing back into the Eastern District.  And this

4    is a drug that has just been declared the deadliest drug with

5    regards to overdose deaths in the United States.  So the

6    government would contend that the defendant should be detained

7    pending trial in this matter.  Thank you, Your Honor.

8              THE COURT:  Ms. Godwin?

9              MS. GODWIN:  Your Honor, I'll address detention

10   first.  We're not in a position today to rebut the

11   presumption.

12             THE COURT:  Okay.

13             MS. GODWIN:  Regarding the probable cause, obviously

14   Mr. Miles' issue may well rest with the stop of the vehicle.

15             THE COURT:  All right.  I've considered the credible

16   evidence and the credible information presented here today.

17   I'm going to find that there's probable cause for the

18   allegations against the defendant.  I note explicitly that --

19   explicitly in Rule 5.1(e) of the Rules of Criminal Procedure,

20   it indicates that at the preliminary hearing the defendant may

21   introduce evidence but may not object to evidence on the

22   grounds it was unlawfully acquired.  So the issues regarding

23   the top will have to be taken up at the appropriate time and

24   motion to suppress.  I know Ms. Godwin obviously knows that

25   and will make the appropriate decision on how to pursue that.

Jeffrey White - Cross

1    So based on what I've heard here, I think there is probable

2    cause to support the allegations against the defendant.  In

3    light of the fact that there is probable cause to believe the

4    defendant has committed an offense under the Controlled

5    Substances Act and he's facing more than ten years -- well,

6    ten years or more in prison, this is a case in which a

7    rebuttable presumption in favor of detention applies.  I'm

8    going to find the defendant has not rebutted the presumption

9    and therefore grant the government's motion for detention.

10   Ms. Godwin, anything further?

11           MS. GODWIN:  No, Your Honor.  Thank you.

12           THE COURT:  Anything further from the government?

13           MR. MILLER:  No, Your Honor.

14           THE COURT:  All right.  That concludes proceedings

15   for Mr. Miles.  He'll be remanded to the custody of the

16   marshals, and we'll be recessed.

17           THE CLERK:  All rise.  This Court will be at recess.

18                   (Court is adjourned)

19                   *  *  *  *  *

20

21

22

23

24

25

(973) 406-2250 | operations@escribers.net | www.escribers.net

CERTIFICATE OF TRANSCRIBER

1

2

3          I, Cynthia Mills, court-approved transcriber, in and

4     for the United States District Court for the Eastern District

5     of North Carolina, do hereby certify that pursuant to Section

6     753, Title 28, United States Code, that the foregoing is a

7     true and correct transcript from the official electronic sound

8     recording of the proceedings held in the above-entitled matter

9     and that the transcript page format is in conformance with the

10    regulations of the Judicial Conference of the United States.

11

12          Dated this 26th day of April, 2019.

13

14

15     /s/ _____

16     CYNTHIA MILLS

17     COURT-APPROVED TRANSCRIBER

18

19

20

21

22

23

24

25